DAVID B. LOGSDON, RESPONDENT, v. CENTRAL DEVELOPMENT ASSOCIATION, INC., A CORPORATION, APPELLANT.—123 S. W. (2d) 631.

Kansas City Court of Appeals.  December 5, 1938.

*Mosman, Rogers, Bell & Buzard* and *Don E. Black* for appellant.

*Henderson & Deacy* for respondent.

BLAND, J.—This is an action in tort for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $500, and defendant has appealed.

Plaintiff, a tenant, from month to month, in defendant's office building located in the City of Independence, on November 1, 1934, while attempting to turn off the water on a lavatory in his office, cut his hand by the breaking of the porcelain handle of the faucet.

The evidence shows that plaintiff is an attorney-at-law and his

offices were occupied by himself, his brother and his stenographer. There were 31 rooms in the office building in question. About a year and a half prior to the injury plaintiff rented Room No. 2 in the building and in the early part of February, 1934, he rented Room No. 3. Thereafter he conducted the business of his profession in the two rooms. The lavatory was situated in Room No. 3. There was no written agreement relative to the renting of these two rooms. The oral agreement was that defendant would furnish the heat, light, water and janitor service, keep the rooms clean and make the necessary repairs. At the time plaintiff rented Room No. 3 he agreed with defendant's manager that defendant would renovate the rooms, put them in condition and take care of any work in the way of repairs that was necessary around the office; that if any repairs were needed, or in the event anything went wrong with either of the rooms, plaintiff would take the matter up with the manager or the janitor.

The evidence further shows that defendant's manager kept keys to all of the offices in the building, including plaintiff's; that he had charge and control of the hallways, stairways, and entrance to the building, the cleaning and repairing of the rooms, the furnishing of heat, hot water and lights and the repairing of broken windows, radiators and light fixtures and other repairs that were needed. The janitor had a pass key to the offices and he would clean the latter after office hours.

The evidence further shows that the lavatory in question was used very little by plaintiff and the other individuals who occupied plaintiff's office suite, as no towels were furnished by the defendant or the occupants, whereas, defendant furnished, in the building, a general lavatory and washroom with towels. The janitor was supposed to keep the lavatory in question clean but discharged this duty indifferently. There were two faucets on the lavatory, one for cold and the other for hot water. Plaintiff testified that prior to the September before he was injured he did not use the lavatory more than once. His brother testified: "I would say it was merely an ornament and used but once a month. It was never used unless the stenographer used it, which was seldom. Q. You didn't see it used more than once a month by anybody? A. No."

Plaintiff further testified that about a month or six weeks before his injury one of the faucets was leaking and he told his brother to notify the manager "to take care of it;" that shortly after that the janitor came and did some work on the lavatory, the witness not knowing exactly what it was; that, thereafter, he did not observe the faucet leaking until the morning he was injured when he attempted to turn it off because it was leaking then.

The faucet was turned off and on by means of a porcelain handle, about the size of one's "finger," which moved horizontally. One

handle contained the word "hot" and the other "cold." It was the hot water faucet that plaintiff attempted to turn off with his left hand at the time he was injured. The handle was about three inches long and was composed of porcelain fitted over a brass shank or stem about a quarter of an inch in diameter. The faucet handle was smaller at the end where it fitted on to the faucet shaft and came out and ended in a "bulbous" tip. There was no screw in the larger end of the handle. Plaintiff testified that he did not use any "unusual force," or any more than he would ordinarily use, in turning the handle on a faucet, but that it "just crushed in the palm of my hand," the left hand; that the porcelain broke into several pieces, but mainly in two large ones; that the break was lengthwise of the handle and extended down diagonally.

After the injury plaintiff noticed the broken pieces of the faucet handle. He noticed that the break started at approximately where the bulb was the thickest and extended approximately to somewhere near the center of the handle. "The break would come from this largest part of this bulbous point here and would run across, not exactly laterally, but in sort of a diagonal position down from this part here and the other part came up (indicating);" that the line of fracture was "perhaps a little below the middle of the side" and ran toward the smaller end in a "downward direction." The porcelain part of the handle was white in color. Plaintiff noticed that there was a discoloration "on the side of this white inside there was discoloration which was quite heavy on the outside, that is, right next to the porcelain covering on the outside, and as it went in toward the inside, of course, it became dimmer until you get clear in close to the shank where it disappeared entirely;" that the soiled portion was perhaps an inch and a quarter or an inch and a half in length, that is, about one-half the entire length of the handle; that the thickest part of it began "just a little back of where the bulbous part of it was, . . . and extended back toward the handle, that is, toward the stop where it was fastened on the faucet proper;" that the discolored portion of it was $1\frac{1}{4}$ or $1\frac{1}{2}$ inches in length; that "it was large enough that it was readily observable by just glancing at it;" that the heavy portion of it (the discoloration) would go back approximately one-third of the entire width from the outside of the porcelain back to the part where it fits into the shank, and would gradually taper off until it got clear into the inside. Of course, as I say, the last small portion of it was a complete clean new break, no discoloration on it at all;" that he would estimate the portion that was not discolored to be an eighth of an inch or a little deeper; that the discoloration was heaviest at the outside; that the color of the discoloration was black. Another witness testified that the discoloration was of the type "that we see on many kinds of

metal or stone or anything like that that is subject to air, dirt will get into anything that is broken."

Plaintiff's brother testified that he examined the broken pieces of the porcelain handle after the injury; that the place where he noticed the dark place was "around the faucet the break of course being diagonal had to extend around the faucet, it would be possibly a half an inch that is around and—Q. About half-way around is that it? A. Yes, about half-way around it;" that in September, 1934, he called in the janitor to fix the leaking faucet in question; that the janitor "took the faucet apart and had some packing and washers and" apparently stopped the leaking; that about a week or ten days before the injury he noticed that the faucet was again leaking; that he notified the janitor again that the faucet was leaking but the janitor did not remedy it.

The stenographer testified that she did not recall any difficulty with the faucet prior to the injury, except that it was leaking about two or three weeks before that; that she reported this to the janitor and he promised to fix it but he did not; that the leaking continued.

Plaintiff, at no time, noticed the defect in the handle prior to the injury. The janitor denied that he had ever seen any cracks in the handle.

Defendant's manager testified that it was not necessary "to do anything with the handle" in fixing a leaking faucet by replacing a washer; that the washer fits on the faucet shaft by a screw and in replacing it the handle of the faucet and shaft would be taken off and the bottom side of the handle would be toward the person doing the work, "you could do it that way" and that the handle might be 12 or 14 inches from the workman's eyes. He also testified that it was the duty of the janitor to fix the faucets when anything happened to them.

There was no testimony that any of the three occupants of plaintiff's suite discovered, at any time, a defect in the handle. Of course, there had never been any complaint concerning the handle or a request that it be repaired. The complaint made to the janitor was merely that the faucet was leaking.

The only point made by the defendant is that its instruction in the nature of a demurrer to the evidence should have been given because it is claimed that no actionable negligence was shown. In the absence of a contract between the landlord and tenant, the former is not liable for damages to the tenant for failing to repair the premises. He is liable only for acts of malfeasance. [Ward v. Fagin, 101 Mo. 699.]

Where the landlord contracts to make repairs and the tenant is injured as a result of the former's failure to make them, the tenant has no right of action in tort, but his action is for damages for the breach of the contract. [Kohnle v. Paxton, 268 Mo. 463; Lahtinen

v. Continental Bldg. Co., 97 S. W. (2d) 102; Dailey v. Vogle, 187 Mo. App. 261.] Even then, if the repairs are to be made upon notice being given the landlord by the tenant there is no liability on the landlord unless reasonable care is not exercised by him after such notice is given. [Section 357, Restatement of the Law Torts, p. 968.]

Where the landlord, whether obligated to do so or not, undertakes to repair the premises and, in doing so, negligently creates a defect or danger whereby the tenant, himself in the exercise of ordinary care, is injured, the landlord is liable. [Byers v. Esses Inv. Co., 281 Mo. 375.] But, in order for him to be held liable it must be shown that he made the premises more dangerous for use, either by changing the physical condition of the premises for the worse or by giving them a deceptive appearance of safety and the tenant neither knew nor should have known of the danger and relied upon the deceptive appearance. [Restatement of the Law Torts, section 362, p. 982.] However, this rule creating liability does not extend so as to relate to the part of the premises that the landlord did not attempt to repair unless affected thereby. [Lipschitz v. Rapaport, 133 N. Y. S. 385; Gehr v. Erie R. R. Co., 271 Pa. 125; Byers v. Essex, supra.] In the case at bar there is no evidence that the landlord attempted to repair the porcelain handle of the faucet.

It seems apparent that unless plaintiff can recover upon the theory that the condition of the faucet handle amounted to a concealed dangerous condition known to the landlord and unknown to the tenant he has no cause of action against the defendant. For the purposes of the case we may assume that there was sufficient evidence from which the jury might have found that the janitor discovered the defective condition of the porcelain portion of the faucet handle when he fixed the faucet and that the defect was not disclosed to the defendant. However, plaintiff's petition is not grounded upon any such theory and the judgment must be reversed. Whether the cause should be remanded so that plaintiff can amend his petition is a matter which we will now discuss.

It is apparent that there would be no object in remanding the case so that plaintiff can amend his petition if, even after it were remanded, he cannot recover in tort under the facts presented.

"A lessee, like the purchaser of a thing already in existence, is presumed to take only after examination. The maxim caveat emptor applies, and if he desires to protect himself in this regard he must exact of the lessor an express stipulation as to the condition of the premises." [1 Tiffany, L. & T., p. 556.] A violation of such stipulation affords no foundation for an action in tort but the action is one for damages for breach of contract. [Kohnle v. Paxton, supra; Lahtineen v. Continental Bldg. Co., supra; Dailey v. Vogl, supra.] Consequently, there can be no recovery in tort by the lessee against the landlord for injuries of the former caused by defect at

the time of the letting, in the absence of fraud, deceit or conceal-ment. [Eyre v. Jordan, 111 Mo. 424, 429; Turner v. Ragan, 229 S. W. 809, 811.] The last (concealment) is said by some authorities, to be the equivalent of deceit. [See Whiteley v. McLaughlin, 183 Mo. 160, 165; Holzhauer v. Sheeny, 127 Ky. 28. See, also, Cowen v. Sunderland, 145 Mass. 363, 364.]

"A lessor of land, who conceals or fails to disclose to his lessee any natural or artificial condition involving unreasonable risk or bodily harm to persons upon the land, is subject to liability for such harm caused thereby to the lessee and others on the land with the consent of the lessee or a sublessee after the lessee has taken posses-sion, if (a) the lessee does not know of the condition or the risk in-volved therein, and (b) the lessor knows of the condition and realizes the risk involved therein and has reason to believe that the lessee will not discover the condition or realize the risk. In order that a lessor of land may be subject to liability under the rule stated in this Section he must actually know of the condition and realize that it involves a risk of harm to those who may use the land in ignorance of it. The lessor is under no duty to either his lessee or those who may be expected to enter the land in his right, to inspect the land in order to discover its actual condition; nor is he under any duty to warn the lessee of a condition which he has reason to believe that the lessee will discover or of the extent of the risk involved in an obvious condition unless he should realize that the lessee is unlikely to appreciate it. . . . Under the rule stated in this Section, a lessor of land who conceals a dangerous condition existing on land having no reason to believe that the lessee will discover it, is sub-ject to liability for bodily harm caused thereby to the lessee and others on the land in his right." [Restatement of the Law Torts, section 358, pp. 969, 971.]

"The rule is that the landlord will not be liable for concealed de-fects or dangerous conditions existing at the time of the demise un-less he know of the defects or had knowledge of facts from which he ought to have known, or will be presumed to have known, of them." [Meade v. Montrose, 173 Mo. App. 722, 726. See, also, Strecken-finger v. Bullock, 60 S. W. (2d) 661; 36 C. J., pp. 220, 221.]

The landlord is not liable if the defects or dangers are such as may be apparent to the lessee on a reasonably careful inspection. [Tiffany, L. & T., p. 562.] "A landlord is not liable to his tenant for any defects existing in the demised premises at the time of the lease that are perceptible to the senses or that can be discovered by rea-sonable inspection or examination." [Roberts v. Rogers, 261 N. W. 354, 356.] The landlord is liable "if there are concealed defects a-bout the premises which are known to the lessor and which a care-ful examination would not disclose to the lessee." [3 Cooley on Torts (4 Ed.), p. 216. See, also, Whiteley v. McLaughlin, *supra*;

Sunasack v. Morey, 196 Ill. 569; Cowen v. Sunderland, *supra*.] The defect is not a latent one if a careful examination will disclose it. [Griffin v. Freeborn, 181 Mo. App. 203, 207.]

It is doubtful if the defendant, in the case at bar, can be held liable on the theory that the defect in the faucet handle was a latent one, within the meaning of the cases, but we do not pass on that question as we are of the opinion that defendant, clearly, is not liable for the reason that there is no evidence that defendant, or its servants, knew of the defect, *at the time of the letting of the premises to plaintiff*. "A landlord's failure to notify his tenant of defects in the premises does not render him liable for injuries therefrom, where the landlord does not acquire such knowledge until after the lease is made. [36 C. J., p. 208. See, also, Meade v. Montrose, 173 Mo. App. 722, 728; Bertie v. Flegg, 161 Mass. 504; Shute v. Bills, 191 Mass. 433; Whitehead v. Comstock & Co., 25 R. I. 423; Long v. Schlitz Brew. Co., 214 Ill. App. 517; Lyon v. Buerman, 70 N. J. L. 620; Rhoades v. Seidel, 139 Mich. 608; Holzhauer v. Sheeny, *supra*; 1 Tiffany, L. & T., p. 659.] The reason that the landlord is not liable for not disclosing to the tenant information coming to him after the letting of the premises of defects that could not have been discovered by the tenant by a reasonably careful inspection is because the whole liability of the landlord grows out of contract and he is held liable on the ground that he has been guilty of the equivalent of fraud in the procurement of the lease in not disclosing the facts to the tenant *before or at the time of the letting*. "As the rule of *caveat emptor* implies, the tenant must look for himself. If, however, there is a latent and dangerous defect, which is not discoverable by observation, or by ordinary care, but which the landlord has knowledge of, it is deemed deceit for him not to disclose the fact to the tenant before the contract of renting is entered into. It is equivalent to positive misrepresentation to the tenant to induce him to enter into the contract. Therefore such knowledge, and implied misrepresentation, having misled the tenant into making a contract without warranty of condition, he will be protected against the consequences of the fraud practised upon him. The circuit court, however, went beyond this. It was ruled at the trial that the knowledge of the landlord of the unsafe condition of the tenement, whenever obtained, must be communicated to the tenant, or the landlord will be liable. This position is wholly out of harmony with the rule itself and the reason upon which it rests. Nor have we been cited, or found, any adjudged case which goes so far. As, in the absence of a covenant to repair, the tenant must make repairs himself, it would afford the tenant no protection in his contract for the landlord to tell him, after the tenant's liability for rent had attached, that there was a defect in the premises; for the tenant could not then decline to enter into the contract, as he could have done if the matter had been dis-

closed to him at first, nor could he regulate the rent accordingly. He might at his own expense repair the defect, it is true; but that would not better his condition under his contract. The landlord's failure to then notify the tenant of the after-acquired knowledge of subsequent defects, might be unneighbòrly, but is not illegal." [Holzhauer v. Sheeny, *supra*, 1. c. 33, 34. See, also, Bertie v. Flagg, *supra*.]

It is true that the landlord in the case at bar agreed to keep the premises in repair but, as before stated, no recovery can be had for a breach, if any, of this agreement in a tort action. The judgment is reversed. *Shain, P. J.,* concurs; *Kemp, J.,* not sitting.